Good morning. May it please the Court, Seth Kretzer for the Appellant, Larry Thompson. Your Honors, I would like to begin this morning with our constitutional argument, our as-applied constitutional challenge to Section 2250, Big A, resounding, redounding to the Kibido opinion. I would like to submit, Your Honors, that the similarities between Mr. Thompson and Mr. Kibido serve to highlight the very important critical distinctions that the Supreme Court based its controlling opinion on. Like Mr. Kibido, Mr. Thompson was convicted of failing to register following a purely intrastate move within the State of Texas. The reason that we would submit there's a very clear distinction between the grounds on which the Supreme Court was able to protect the constitutionality of that statute with regard to Kibido but not to Mr. Thompson was, of course, the fact that Mr. Kibido had served in the armed forces. The necessary and proper clause, there's no doubt, that is the beginning and end of the Kibido opinion. Both the majority, the concurrence, and the dissent cite the famous language we all learned in law school from McCulloch v. Maryland, let the end be legitimate, and so forth. It's our position, Your Honors, that Kibido was necessarily confined to the military regulations clause of the Constitution. That would be— JUSTICE KENNEDY Let me ask you this. MR. THOMPSON Yes. JUSTICE KENNEDY I mean, Congress certainly had authority, did it not, under the Commerce Clause to enact the child porn statute? MR. THOMPSON Yes, yes. JUSTICE KENNEDY So why isn't it necessary and proper for Congress to have—I mean, there's a relationship between SORNA and the Child Porn Act, just like in Kibido, there's a rational relationship between the conviction under the military code and SORNA. So what's the big difference there? MR. THOMPSON I would argue, Judge Davis, the answer to your question is two-pronged. First, of course, is that Congress is not allowed to usurp a general police power that's in the hands of the states. And my second support comes not from me, but directly from the words of Chief Justice Roberts in his concurrence, quote, the fact of a prior Federal conviction by itself does not give Congress a freestanding, independent, and perpetual interest in protecting the public from the convict's purely interstate conduct. In other words, Judge Davis, I don't dispute at all that, of course, Congress had the power—and SORNA has been attacked under numerous different constitutional provisions, there's no doubt—Congress had the power to enact the pornography statutes and so forth pursuant to the Commerce Clause. That does not mean that Congress has a general police power to do what they did with regard to Mr. Kibido. That was, of course, pursuant to the enumerated military power, but no such similar enumerated power with regard to people who've never been in the military or, Judge Davis, I would argue even if you more broadly read Kibido, to the special jurisdiction of the United States. JUSTICE KENNEDY Justice Roberts, Chief Justice didn't get another vote on that concurrence, though. MR. WHEELER Justice Alito, yes. Justice Alito joined Justice Roberts' concurrence, and then both Justices Thomas and Scalia authored the dissent. Now, there's all three, of course, were concerned—the latter two, the concurrence and the dissent, were the ones that talked the most about the need—the reality, the constitutional tautology there was no general Federal police power. I would submit, Judge Davis, that Kibido, of course, is a very interesting opinion. It arose from the circuit. So I went back and read all the prior Kibido opinions. There's so many, it can kind of get confusing, but I referred them in the motion to dismiss as numbers one and number two. The very first Kibido opinion, written back in February of 2011, Judge Dennis' concurrence warned or disagreed with the majority, quote, the majority interprets the relevant statute, capital—subparagraph capital A, quote, as a standalone statute that is rationally related only to a preexisting military penal statute, rather than as a necessary and integral part of a Commerce Clause-based SORNA. I would argue, Judge Davis, that goes directly to the question you just asked me. The problem is—not the problem, the reality is the Supreme Court hinged or pivoted their holding in Kibido on that exact reality, that the enumerated power was the ability to create needful regulations for the armed forces. Kennedy. The majority didn't say that, did it? The Tenth Circuit KFL, by 28J, letter yesterday, the opinion that I said was most inimical to the arguments that I'm advancing at present was the Tenth Circuit opinion from 2014, I believe it was Bruni, I'm sorry, yes, B-r-u-n-e, if I'm mispronouncing his name, where that's what the Tenth Circuit said, quote, nothing in the majority opinion isolates the military regulation clause as the sole foundation for congressional in support of SORNA. That's at page 1017 of the Bruni opinion. And yet, Your Honor, I read that, I went back and looked at this, it's straight from the Kibido majority that Justice Breyer wrote, and starting at page 2503, this is, of course, of the SCT site, and he said, quote, here, under the authority granted to it by the military regulation and necessary and proper clauses, Congress could promulgate the uniform code of military justice. Next sentence, it could specify the sex offense of which Kibido was convicted was a military crime under the code. So there's no doubt, maybe they weren't as explicit as Justice Roberts was, that's, of course, why he concurred. If they had been as explicit, he presumably would have just joined the opinion. But even the majority, Judge Davis was based, talks extensively about necessary and proper and military regulations. That doesn't happen to be the conviction in this case, so I didn't mean that some other underlying conviction that Congress would authorize to legislate for wouldn't follow the same rule. I'm sorry, I don't know if you're saying that the— Well, in this case, obviously they were talking about the military conviction because that's the conviction that was — that the defendant had in Kibido. Yes. But, I mean, that doesn't mean that it wouldn't follow that if Congress had authority to legislate another crime that the necessary and proper clause wouldn't pick up, and if there's a rational relationship between that crime and SORNA, that that wouldn't be enough. I mean, just because they talk about the crime of conviction in that case doesn't — to me, doesn't mean it's Cabinet's decision. Well, as Justice Roberts famously told the American people at his confirmation hearings, we don't decide more if it's not necessary to decide more. So the opinion in Kibido rested on the crime under the Uniform Code of Military Justice that was presented there. As our argument, Judge Davis, that unless and until the Supreme Court says that the logic of Kibido, under necessary and proper, goes more broadly than that, then, yes, anything outside of that context necessarily falls into the impermissible realm of the prohibited general police power. I would argue, Judge Davis, you could read — and we considered as much in the briefs — a broad reading of the majority opinion in Kibido would not go outside the military power proper to other people — to include other people within a special relationship to the Federal Government, people who value rather on Federal property. I would argue that's exactly the situation which the Ninth Circuit found when they — in the case of Elk Shoulder, which we also cited in our 28J letter, obviously a Native American name. That gentleman had gone to the Indian reservation. The Ninth Circuit was able to resolve the case on the property clause, using the language — we don't use that language anymore, but Indian tribes, Indian property, the language of the Constitution, and for the Native American legal issue. That was a broad reading of Kibido.  JUSTICE KENNEDY I think we'll find a lot of cases where the necessary and proper clause has been applied to legislation other than military or some other special relationship. I mean, to me, the general rule is, if Congress had the authority to legislate the underlying crime, then if it's necessary and proper for them to, you know, pass a statute like SORNA, then that's authorized. You don't necessarily look to whether they had authority in a given case to legislate, like, you know, prohibit intrastate travel or — without registration. You look to the underlying crime, and then the necessary and proper clause provides a necessary authority. MR. WARREN Well, Your Honor, just a couple things. One, if that's true without qualification, then there's nothing left of the prohibition against a general federal police power. Congress could literally irrigate any power, kind of like  JUSTICE KENNEDY No. You're dealing here with the underlying crime involving the pornography, child pornography, which is unchallenged. Congress has the right to regulate. Then, in order to implement the necessary punishment and collateral aspects of the crime, they have the right to impose this registration. There's no dispute they have the right to do that. Your argument would be that once he is registered upon conviction and being released from prison, that he can just go anywhere he wants within a state and not register again, which totally undermines the underlying statute. That's just — that can't be. MR. WARREN Well, Judge Burschel, there are, of course, other ways that Congress can still achieve the policy goals that it enunciated when passing the legislation. And, of course, the dissent in Kibito, Justice Scalia and Thomas, showed that at length. For example — and I pulled these regulations, which are a little more germane to our jury instructional challenge that the Attorney General promulgated — there is this procedure through the SMART office — I don't know what the acronym means, but it's an office of the Department of Justice — that gives budget cuts for certain crime prevention programs for states if their compliance is not up to the internal standard the Attorney General has established. Just like in South Dakota v. Dole, where the Congress wanted every state to raise the drinking age to 21, they conditioned the transportation funds. Similarly, there's no doubt that they could legislate or punish people who cross state lines, interstate travel. That, of course, is the requirement if someone's going to be federally prosecuted under that same provision of 2250 for folks who were originally convicted in state court, not federal prisoners. So there's any number of ways that Congress could continue to get the ultimate end result. It's our position, Judge Barksdale, that with regard to what they were trying to do here to people who've never been within the special jurisdiction of the United States or had a special relationship with the federal government, that that does cross the realm into the impermissible police power. I would not frustrate the entire structure of SORNA. There's still many other things that Congress could do that would allow them to — and they are doing — that allow them to, the executive branch, to impose these conditions on the states to get this statewide more unified framework that Congress obviously thought was more desirable in the previous Weddelling Act. You have a lot of other issues. I do. Okay. The next issue that, of course, I would turn to, Judge Davis, is our jury instructional issue. The key case, the time I wrote the brief and I checked again as of yesterday, is Wampler. I don't believe it's ever been cited again by an opinion of this Court. And Wampler really is twofold. The initial part — You conceded our precedent in Wampler foreclosed your challenge to the instruction about the definition that resides. The first part of my challenge, yes, Judge. Well, of course, we do argue the controlling authority of Wampler. If I could convince this panel to say they were bound by the authority of Wampler, but perhaps it should be revisited on Bonk, that would, you know, obviously be an area where my client would want to go. But if I can't convince you of that, then I would move on to the second part of my challenge. The second part of the challenge, though — and these are a little bit inconsistent, Judge Barksdale, I would concede. It seems to me that either the rule has to be if a judge in crafting the jury instructions — controlling, of course, it has to be tailored to the evidence of the individual trial — they can either go on to what Wampler referred to as the gloss of these regulations promulgated by the Attorney General, or they cannot. But it's simply palely unfair just to cherry-pick this word or that word out of the definitions promulgated by the Attorney General. And that's what Judge Juneau had done down below in Wampler. Now, there — I'm talking about the 30-day durational residency requirement. There, there's no doubt in footnote 2 this Court said that they were not going to reach that issue because no argument had been made down below. It had been forfeited. I think it was even forfeited in the original opening brief. By contrast, there's no doubt that the AFPD on Mr. Thompson's case, who tried the case, was very conscious of that and held up Wampler and got — as you were talking all about, that he wanted to make sure he didn't fall into the same mistake that that lawyer did. So in other words — and in Wampler, everything after the first sentence describing the word resides, these other three clauses, all came from outside the statute. It's our first-level position that there's nothing inherently so technical about these words that they should be defined by anything other than the plain language of the statute. But if they are, then it has to go entirely. You just can't allow what, you know, effectively this — our complaint, Judge, and this is at page 7 of the jury instructions, the very last instruction on that page, quote, the permanent abandonment of an abode constitutes a internal, quote, change of residence, regardless of whether a new residence has been formally adopted. That virtually instructs a guilty verdict. By contrast, there's no doubt, excuse me, that the statute of SORNA itself has this three-day requirement, and yet the attorney general has said that we look at residence up to 30 days. That is language that would allow a defendant, were they to get that instruction, to argue to the jury, look, jury, my client did not have the intent to change his registration, to change his residence in an impermissible period of time. If you're going to use part of those, what this Court called a gloss and wampler, it's only fair that the defendant, and there was some evidence of that in this case, I'm saying, of course, that they do some evidentiary minimum, that they get an instruction on that. That — and that's specifically what Mr. Thompson's lawyer asked for down below. Why are you representing him on appeal when he was represented by a federal public defender at trial, your court appointed? I was court appointed. I don't know. Perhaps — I don't know the policy of their office that they handle their own appeals. I don't know the answer to that, Judge. I have no idea. So — We're glad you're here. Oh, well, thank you. I'm glad to be here. But, I mean, you know, there are several cases that say that SORNA requires a convicted sex offender to update his registration information in person upon terminating his current residence with no intention of returning, even if he hadn't established a new residence. I mean, there's a lot of — there's several cases that offer that. Yes. And that, of course, Judge Davis, would fit the government's theory of the case. And, of course, we don't argue the government shouldn't be allowed to put on their theory of the case and get instructions that they could argue would support it. The problem, though, is that the defendant is allowed to put on their theory of the case. And his theory of the case here was that he had not permanently left Corpus Christi. They had shut down that one apartment. But the fact that he didn't put on a forwarding address, he was still receiving a Social Security benefit, so he wasn't like someone who was going to go become homeless. And they went — there's — I'm sorry, my time is up, Judge Davis — SORNA does not punish travel. It only requires registration upon the establishment of a new residence. And Mr. Thompson's theory of the case, which he argues is entitled to instructions on if the jury chose to go with his version of the evidence, was that he was engaged in nothing more than intrastate travel, that he didn't go that next level to showing the establishment of a new residence. Okay. Thank you, Mr. Cressy. Okay, Mr. Thompson. May it please the Court. Your Honor, as to the first issue in this case, whether or not SORNA was unconstitutional as applied to the defendant, the district court held a hearing, a pretrial hearing, in which they looked at the defendant's prior conviction for the possession of child pornography, and they held that, upon his release, just as the defendant in Kebido, that Mr. Thompson was going to have the Jacob Wetterling Act apply to him as well, that based under the language of the act, it applied to Mr. Thompson, it applied to his conviction, the same as it applied to Mr. Kebido. Because of this, this defendant had a special relationship with the federal government, even after his release from prison and his release from his supervisory — Tell me what that relationship was. The relationship is that, under the Jacob Wetterling Act, he was required to register as a sex offender. There was a requirement, and when SORNA came into effect in 2006, the Jacob Wetterling Act was repealed, but SORNA basically took over and slightly altered those requirements, but maintained that relationship. In this case, Mr. Thompson has always had a special relationship with the federal government, just like the defendant Kebido did in the Supreme Court case. As to the second issue in this case, the appellant argued that the defendant's change of residence was not sufficient to sustain his conviction, and as you heard the appellant just say, right now when they were talking to the court, that the defense in the case was the defendant had left Corpus Christi temporarily and had planned to come back, but actually, at trial, the evidence was the exact opposite, and so much that during closing argument, the defense attorney stood up, and it's on the record at page 704, and said, you got me. He did it. He abandoned. He is gone. Okay. He is changing his residence. At trial, the evidence showed they permanently abandoned the residence in Corpus Christi, that they were not coming back to Corpus Christi, so much that the defense conceded in closing argument that, in fact, he had abandoned his residence in Corpus Christi. He made that statement in closing argument? The defense attorney made that statement in closing argument, Your Honor. Is that all you rely upon? I'm sorry. That's not all you rely upon, I hope. No, Your Honor. In addition to that evidence in the case, when the various witnesses testified, what As I understand it, the defendant, when he left Corpus Christi, had a lease pending in McKinney, but something happened to the lease. You mentioned this in your brief at 3. So give us some details about that lease for an apartment in McKinney. Yes, Your Honor. What had occurred, and what the defendant's roommate and friend, Matthew Hunt, testified to, was that while they were planning their move from Corpus Christi for the prior two or three months, he had used an apartment locator service to find an apartment in McKinney, Texas, that they had an address for that apartment, but upon their arrival, the apartment locator service had not worked and it had fallen through. So when they arrived in Corpus Christi, Texas, the apartment that they originally were going to go to was no longer available. There was no lease that they had executed? No, Your Honor. They had not actually signed a lease, and it was after that point that they began living at a hotel and bouncing between the hotel and the park. During the testimony in the case, what also came out was the apartment manager, when she arrived at the apartment complex, noticed that the U-Haul truck was gone and the keys were on the table. She went and looked in the apartment and it was vacated. They had completely left it. There was also a monthly sex offender treatment that the defendant was required to attend in Corpus Christi. When they contacted the defendant to ask him whether or not he was coming for his appointment, he said, no, I'm no longer going to do that. Circling back to what I asked you, in your brief at 3, the government states, upon arrival in McKinney Thompson and Hunt's apostrophe S agreement for an apartment lease fell through. So what was the agreement? The agreement was the apartment locator service that Mr. Hunt had used to locate the apartment. His testimony was he had used it and when he arrived, it had fallen through. Is there something you sign over the internet with this apartment locator service that, yes, I want this apartment or something, sort of like Groupon, where you can get a hotel room? What's the agreement? That's what I want to know. As far as the actual agreement that they had, Your Honor, I don't know the specifics of it. But from Mr. Hunt's testimony, he thought that it was set up and ready to go. The apartment complex, when he arrived, did not have it. Set up and ready to go through this apartment locator service? Through the apartment locator service. All right. Thank you. How long were they out of Corpus Christi? For 21 days, Your Honor. Was there evidence that they were looking for another apartment? During the time they were in Corpus Christi, the evidence was that they were living in the hotel until they ran out of money. I believe Mr. Hunt then testified that they relied on their ingenuity and at that time they would go back to the park where they had their U-Haul truck kept and set up inside as a living room and just lived in the park and went from the park to the hotel until they were encountered in McKinney at the park. Didn't one of them have a relative in McKinney? Did one of them have a son in McKinney? Yes, Your Honor. Mr. Hunt had a son that resided in McKinney and that was one of the reasons that Mr. Hunt wanted to leave Corpus and one of the reasons they both planned to leave. The other one being that they felt that Corpus Christi was dangerous. And when the defendant was located, they were living out of their Ryder truck, rental truck? Yes, Your Honor. Did they have all of their furniture, et cetera, et cetera, in the truck from their apartment in Corpus Christi? Yes, Your Honor. They had a U-Haul truck that they rented on a one-way rental under Mr. Thompson's name. The police officers testified when they looked in the back of the truck that it was set up kind of as a living room set up with their furniture inside the truck. And I believe Mr. Hunt also testified that, yes, when they were living out of the truck, they kind of had it set up as they would set up their living room. As to the third issue in this case, Your Honor, the appellant had objected to the admission of the statements by Deputy Lujan concerning the interview with Mr. Thompson in 2011. The court had held a pretrial hearing and watched a videotape of this interview. Mr. Thompson had been deported from Mexico and had been brought to Houston to the police department for this interview. He had been read his rights, he went over the Miranda form, and he never unambiguously asked for an attorney. If you go back and review the tape, which the court did review, the video, you can see on multiple occasions that the appellant, Mr. Thompson, jokes about getting an attorney, but then waves and says, no, no, no, I don't want an attorney. And this was evidence that was presented through this Marshal Lujan, and he, the key testimony he presented was he had instructed Thompson about procedure you have to go through for registration, something to that effect. Yes, Your Honor. How is his testifying about what he told the defendant a Miranda violation, since it's not the defendant's testimony that's being used, it's simply the Marshal's testifying about what he told the defendant? And it's the government's position that it's not, Your Honor. The only testimony from Mr. Thompson that was a statement from him was when he verified that he was the person who was convicted of the sex offense in Oklahoma. That was the only statement that was introduced during the trial from Mr. Thompson. The remainder of the testimony was from Deputy Lujan telling Mr. Thompson, his statements informing Mr. Thompson of what the requirements are under the Sex Offender Registration Notification Act. All the other statements from Deputy Lujan to Mr. Thompson, I believe, would not be a Miranda violation at all, because they are not Mr. Thompson's statements. The only statement that could possibly have come close to a Miranda violation was the statement where he verified his sex offender status. And then looking at the final issue, Your Honor, the jury instructions in this case, the court submitted a jury instruction that went beyond the definition in the statute. And looking at the facts of this case, the court took it and clarified it so that the jury would have a better understanding of the law. The specific item which the defendant has been objecting to involving the permanent abandonment of an abode came from the case law that the court looked at concerning specifically people who don't have a fixed place of residence but have given up their residence and have moved on, saying they cannot bounce within an area and that you have to update even if you have established a new residence. The 30-day requirement that the court looked at and said they were not going to include would have made the instructions more confusing in this case, because the defendant himself had changed his residence. When you look at the Attorney General Guidelines and it talks about the 30-day requirement, it provides an example of a situation in which someone maintains a residence in one place yet goes to visit their significant other in another place. In this situation, the defendant had completely abandoned his residence as the court had looked to and as the court had held. In their Rule 29 argument, as well as talking about the jury charge, it said the evidence here clearly shows he left Corpus Christi and abandoned his residence. In this case, the 30-day habitually lives definition would not have applied because the defendant had permanently left his residence and, therefore, he was required to register within 72 hours, just as the Attorney General Guidelines state. And, Your Honor, I'm at the end of my prepared remarks, so unless there are any further questions from the court, I will yield my time back to the court. Okay. Thank you, Mr. Chairman. Mr. Crutcher, back to you. I'll begin with an answer to a question Judge Barksdale had asked the prosecutor. I pulled up the testimony, starting at page 585 of the record, where Mr. Hunt was asked about the apartment locator service. The actual testimony about the apartment locator service appears to be more on 586. Question, and you said that had fallen through. What happened? Answer, the property locator that I, as Mr. Hunt, hired did not fulfill their end of the deal. Question, so when you arrived in McKinney, how did you find this out? Answer, the property manager didn't know who I was. She didn't recognize the receipt that I had. When that occurred, where did you decide to stay? At the Regency Inn and Suites. The point would just be, Judge Barksdale, not so much that the locator did or didn't do whatever they were required to do under their contract, whatever agreement they had, but Mr. Hunt was only talking about himself. There's no doubt, as Judge Jenna said, that Mr. Hunt, a son, lived up in the area. It's Mr. Hunt who had apparently arranged with the apartment locator that fell through. These are all conduct of Mr. Hunt. Now, I don't dispute the government has some evidence on to tend to support their theory of the case. It goes not so much, Judge Barksdale, to my client's theory of insufficient evidence, but, again, back to the fact that he should have been allowed that jury instruction as to the 30 days requirement, or the 30-day requirement, the 30-day I call it a safe harbor, but the 30-day window that the attorney general has identified for the exact reason that the jury might have had that instruction been given, been allowed to go with Mr. Thompson's theory of the case, which is that he was gone for far less than 30 days, and he was simply traveling with Mr. Hunt, the man who, by all accounts, and it goes on for a couple more pages. I don't have time to obviously read all of it here, but he was Mr. Hunt was the one who had made the arrangements up there in McKinney. And, yes, Judge Barksdale, as you pointed out, when they were actually found in McKinney, they were having some sort of a barbecue or something out of the back of this truck, in the park, I forget the name of it, the park up there in McKinney. A defendant could argue to a jury, ladies and gentlemen of the jury, this shows that Mr. Thompson did not intend to permanently relocate. This shows that Mr. Thompson was not going to stay up there. He was simply traveling with a friend who was going up there for his own reasons, and they were having a barbecue. That are the two different constructions of the evidence that a defendant should fairly be allowed to argue to the jury. Is that? Yes. Oh, I thought you were going to ask me a question, Judge Davis. The next question I would ask, or the question I would ask, I apologize, the next argument I would make in response to a question that Judge Barksdale asked goes to the issue of Miranda. I know I didn't get to that in my opening presentation, but since the prosecutor discussed it, I'd go ahead and argue it. It seems to me that it's an interesting voluntariness, totality of the circumstances Miranda analysis. With regard to Davis, there's no doubt the controlling Keefe Supreme Court case on whether the request for counsel was sufficiently definite so as to let the authorities know they should stop the questioning. I'm reading directly, Mr. Thompson's, towards the beginning of his interrogation. Thompson, I want an attorney, of course. There is nothing at all tenuous or uncertain about that. The very next thing the agent said, if you want a lawyer, if you want a lawyer, I can't talk to you. But if you don't want to talk to me, just sign this. And that's when he handed him what turned out to be the consent form. I don't think, that seems to me to be a very alarming Fourth Amendment violation, when someone uses unequivocal language, I want a lawyer, of course, and the very next thing the agent says is factually untrue, and then hands the man, I've talked in the briefs about his health problems, of course, he was somewhat sleep-deprived, he's been taken off the airplane, hands someone a form that that agent is misrepresenting what it is. I mean, you go back to the original Miranda case, they talk about police trickery. This is, I mean, I know that Judge Schell called it a mere misstatement by the agent. Be that as it may, what he said to the defendant was untrue. The harm, Judge Barksdale, which I think was the question you had asked the prosecutor, yes, most of the agent's testimony about this was things that he had told the defendant. If the government at the trial had wanted to leave it at that, that might be a very different situation. But the very first thing when they got to this statement, before the agent started testifying about the things that he had said, question. And when you conducted the interview with the defendant prior to asking him questions or going into your interview, did you advise him of his Miranda rights? Answer, I did. So in other words, we would argue what the government tried to do here. They weren't content to sit back, they already had a discovery violation on this statement. They weren't content to sit back and just walk away from it and rest on the other evidence they had in this case. They chose to build up the importance of what the agent then said and all the questions that followed, which were reproduced on page 30 of my brief, after having established that this was a Mirandize conversation. If they had wanted to walk away from it, they could have, but they really wanted to hone in on that. And we would argue that may have elevated the importance of that testimony in the eyes of the jury. If it was a Miranda violation and the government was then allowed to adduce testimony from the agent saying, and you gave him his Miranda rights, right, we would argue that that in and of itself shows both the Fourth Amendment violation and the palpable harm for which this Court should reverse for a new trial. Okay. Thank you, Mr. Gretzky. You're a court opponent and the Court appreciates your service. That'll be a service. Thank you.